## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PROSPECT DCMH LLC d/b/a DELAWARE COUNTY MEMORIAL HOSPITAL<br><br>*Plaintiff,*<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services,<br><br>*Defendant.* | Civil Action No. 24-cv-04678-PD |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2025,

upon consideration of Defendant's Motion for to Dismiss and any response thereto,

it is ORDERED that Defendant's motion is GRANTED.  Plaintiff's complaint is

DISMISSED WITH PREJUDICE.


BY THE COURT:


_____
HONORABLE PAUL S. DIAMOND
*Judge, United States District Court*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PROSPECT DCMH LLC d/b/a DELAWARE COUNTY MEMORIAL HOSPITAL<br><br>*Plaintiff,*<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services,<br><br>*Defendant.* | Civil Action No. 24-cv-04678-PD |

## <u>DEFENDANT'S MOTION TO DISMISS</u>

Pursuant to Fed. R. Civ. P. 12(b)(1), defendant, Secretary of the U.S. Department of Health and Human Services, hereby moves this Court to dismiss for lack of subject-matter jurisdiction the complaint of Plaintiff Prospect DCMH LLC d/b/a Delaware County Memorial Hospital.  Plaintiff lacks Article III standing to bring this action because it has suffered no injury-in-fact that could be redressed by a favorable ruling and has failed to state a valid basis for federal jurisdiction.

WHEREFORE, for the reasons stated in the accompanying Memorandum of Law, the Defendant respectfully requests that this Court grant his Motion and dismiss Plaintiff's complaint with prejudice.

Date: January 10, 2025

Respectfully submitted,


JACQUELINE C. ROMERO

United States Attorney


*/s/ Eric S. Wolfish*
ERIC S. WOLFISH
Special Assistant United States Attorney
Eric.Wolfish@hhs.gov
(215) 861-4511

Gregory B. David
Assistant United States Attorney
Chief, Civil Division
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Gregory.David@usdoj.gov
(215) 861-8521

*Counsel for Defendant*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PROSPECT DCMH LLC d/b/a
DELAWARE COUNTY
MEMORIAL HOSPITAL

                    *Plaintiff,*

                v.                          Civil Action No. 24-cv-04678-PD

XAVIER BECERRA, in his official
capacity as Secretary of the United
States Department of Health and
Human Services,


                    *Defendant.*


# DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
# <u>MOTION TO DISMISS</u>

# **TABLE OF CONTENTS**

I.  INTRODUCTION ....................................................................9

II.  REGULATORY BACKGROUND .....................................................3

  A.  Enrollment of a Hospital in Part A of the Medicare Program ..............3

  B.  Termination of a Part A Provider Agreement .......................................4

III.  FACTUAL AND LEGAL BACKGROUND .........................................5

  A.  The Hospital's Plan to Close, Fire its Employees, and Potentially
Reopen at Some Later Time .....................................................................5

  B.  Litigation Regarding the Hospital's Closure Plan ...............................8

  C.  Termination of the Hospital's Provider Agreement ...........................10

IV.  STANDARD OF REVIEW ......................................................11

V.  ARGUMENT ........................................................................12

  A.  Plaintiff Has Not Suffered an Injury in Fact .......................................12

    1.  The termination of Plaintiff's provider agreement was consistent
with the Medicare statute and regulations. ......................................................13

    2.  Novitas was authorized to issue the termination letter. ...................17

    3.  Plaintiff did not suffer a due process violation. ...............................17

    4.  Even if Plaintiff established a statutory violation, it would not
suffice for Article III standing. .........................................................................20

  B.  Plaintiff Cannot Satisfy the Other Elements of Standing ...................21

  C.  Plaintiff Has Not Alleged a Valid Basis for Federal Jurisdiction .......23

VI.  CONCLUSION .......................................................................26

# <u>TABLE OF AUTHORITIES</u>

**Federal Cases**                                                                 **Pages**

*Agendia, Inc. v. Becerra*,
   4 F.4th 896 (9th Cir. 2021) ................................................................... 17

*Axon Ents. v. FTC*,
   143 S. Ct. 890 (2023) ........................................................................... 24

*Ballentine v. United States*,
   486 F.3d 806 (3d Cir. 2007) ................................................................. 11

*Berkery v. Comm'r*,
   No. 09-4944, 2010 WL 99376 (E.D. Pa. Jan. 11, 2010) .................................. 24

*Cervoni v. Sec'y of Health, Educ. & Welfare*,
   581 F.2d 1010 (1st Cir. 1978) .............................................................. 18

*Cestonaro v. United States*,
   211 F.3d 749 (3d Cir. 2000) ................................................................. 11

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................ 21

*Clinton County Comm'rs v. U.S. Envt'l Prot. Agency*,
   116 F.3d 1018 (3d Cir. 1997) ............................................................... 23

*Erickson v. United States*,
   67 F.3d 858 (9th Cir. 1995) .................................................................. 17

*FDIC v. Meyer*,
   510 U.S. 471 (1994) ............................................................................ 23

*Heckler v. Cmty. Health Serv. of Crawford Co., Inc.*,
   467 U.S. 51 (1984) .............................................................................. 22

*Hindley v. Dep't of Health & Human Servs.*,
   2017 WL 1398257 (N.D. Cal. Apr. 19, 2017) ................................................. 18

*Illinois Council v. Shalala*,
   529 U.S. 1 (2000) ............................................................................... 12

*In re BR Healthcare Sols., LLC*,
   2021 WL 4597761 (W.D. Tex. Oct 6, 2021) .................................................. 16

*Johnson v. Becerra*,
    668 F. Supp. 3d 14 (D.D.C. 2023) .............................................................. 19-20

*Kaiser v. Blue Cross of Cal.*,
    2006 WL 8448699 (D. Idaho Sept. 22, 2006) .................................. 16

*Kamal v. J. Crew Group*,
    918 F.3d 102 (3d Cir. 2019) ......................................................... 20

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
    926 F.2d 1406 (3d Cir. 1991) ...................................................... 11

*Koerpel v. Heckler*,
    797 F.2d 858 (10th Cir. 1986) ..................................................... 18

*Kokkonen v. Guardian Life Ins. Co.*,
    511 U.S. 375 (1994) .................................................................... 23

*Lane v. Pena*,
    518 U.S. 187 (1996) .................................................................... 23

*Lilia Gorovits, M.D., P.C. v. Becerra*,
    2021 WL 1962903 (E.D. Pa. 2021) .............................................. 18

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................... 12

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) .................................................................... 19

*Mulholland v. Gov't Cnty. of Berks, Pa.*,
    706 F.3d 227 (3d Cir. 2013) ....................................................... 19

*Ne. Emergency Med. Assoc. v. Califano*,
    470 F.Supp. 1111 (E.D. Pa. 1979) .............................................. 18

*Norman v. United States*,
    1996 WL 377136 (E.D. Pa. July 3, 1996) .................................... 11

*Parkview Adventist Med. Ctr. v. United States*,
    842 F.3d 757 (1st Cir. 2016) ................................................. 19, 25

*Parkview Adventist Med. Ctr. v. United States*,
    2016 WL 3029947 (D. Me. May 25, 2016) ................................... 25

*Parrino v. Price,*
  869 F.3d 392 (6th Cir. 2017) ............................................................... 17

*Pennsylvania v. New Jersey,*
  426 U.S. 660 (1976) ............................................................................. 21

*Raines v. Byrd,*
  521 U.S. 811 (1997) ............................................................................. 11

*Rite Aid of Pa., Inc. v. Houstoun,*
  998 F. Supp. 522 (E.D. Pa. 1997) ....................................................... 18

*Senape v. Constantino,*
  936 F.2d 687 (2d Cir. 1991) ........................................................... 17-18

*Shah v. Azar,*
  920 F.3d 987 (5th Cir. 2019) ......................................................... 18, 17

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ..................................................... 11-12, 12, 20

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ............................................................................... 23

*Thole v. U.S. Bank N.A.,*
  590 U.S. 538 (2020) ............................................................................. 21

*Trust Under Will of Wills v. Burwell,*
  306 F. Supp. 3d 684 (E.D. Pa. 2018) ................................................. 14

*United States v. Mitchell,*
  445 U.S. 535 (1980) ............................................................................. 23

## Federal Statutes

28 U.S.C. § 1331 ....................................................................................... 24

42 U.S.C. § 1395cc .................................................................... 3, 4, 5, 13, 24

42 U.S.C. § 1395ff ...................................................................................... 4

42 U.S.C. § 1395kk-1 ............................................................................... 17

42 U.S.C. § 1395x .......................................................................... 2, 4, 13

42 U.S.C. §§ 1395-1395ccc ............................................................... 3, 12

## Other

42 C.F.R. Chapter IV ........................................................................... 3, 4

42 C.F.R. § 400.202 ................................................................................ 3

42 C.F.R. § 482.11 .................................................................................. 4

42 C.F.R. § 489.52 ......................................................................... passim

42 C.F.R. § 489.53 .................................................................................. 4

42 C.F.R. § 489.54 .................................................................................. 4

42 C.F.R. §§ 489.52, 489.3 ..................................................................... 5

U.S. Const. Art. III, § 1 ........................................................................ 11

## I.    <u>INTRODUCTION</u>

Plaintiff Prospect DCMH LLC d/b/a Delaware County Memorial Hospital ("Plaintiff" or the "Hospital") challenges the Secretary's finding that it voluntarily terminated its Medicare provider agreement effective November 7, 2022. The Hospital, however, has remained closed for over two years and the state has revoked its license. The Hospital's main entrance is currently shuttered, with chairs and a barricade blocking the doors and a tarp obscuring the entryway sign (D. Ex. 1):



In light of the Hospital's closure, and lack of any alleged plan to reopen, Plaintiff can neither show a concrete injury traceable to the Secretary nor any stake in the outcome of this case. A hospital voluntarily terminates its Medicare provider agreement by a "cessation of business," which is effective on the date when "it stopped providing services to the community." 42 C.F.R. § 489.52(b)(3). The Secretary found that the Hospital voluntarily terminated on November 7, 2022, by

which time it had permanently ceased to provide in-patient care:

- Plaintiff had filed a WARN notice advising of an impending "closure";

- Plaintiff admitted to an "exodus of employes and physicians";

- The Hospital ceased providing diagnostic and therapeutic services because it closed its emergency and radiological departments;

- Plaintiff opposed an injunction to keep the Hospital open and filed an affidavit stating that it did "not plan to bring additional patients" to the Hospital;

- The Pennsylvania Department of Health ("PA DOH") suspended the Hospital's emergency department services and imposed a ban on admissions;

- The PA DOH found that the Hospital "does not intend to offer any services, care or treatment to inpatients . . . for the foreseeable future."[1]

Although Plaintiff alleges that the Hospital continued to offer some out-patient services after November 7, 2022, Compl. ¶ 1, services offered by out-patient clinics do not satisfy the definition of a "hospital" under Medicare law.  *See* 42 U.S.C. § 1395x(e) (requiring a "hospital" to be primarily engaged in providing inpatient care under the supervision of physicians).  Notably, the Complaint does not allege that Plaintiff continued to provide hospital-level services, such as an emergency department and in-patient beds, after November 7, 2022.

Meanwhile, even if Plaintiff were to show that the termination was

---

[1] The supporting exhibits are discussed in Section III, and as noted in Section IV, the Court may consider evidence outside of the complaint in a motion challenging jurisdiction.

erroneous, it has not alleged any concrete injury. Plaintiff does not allege any tangible harm caused by its termination, such as a financial loss. Plaintiff also cannot show an intangible injury, because courts have overwhelmingly rejected any "right" to participate in Medicare. Given the fact that the Hospital has been closed for over two years with no plan to reopen, Plaintiff's interest in this litigation is unclear and the Complaint provides no additional clarification. Finally, Plaintiff fails to state a valid basis for federal jurisdiction. Accordingly, the Secretary moves to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

## II.     <u>REGULATORY BACKGROUND</u>

### A.      **Enrollment of a Hospital in Part A of the Medicare Program**

Congress established the Medicare Act in the Social Security Act, 42 U.S.C. §§ 1395-1395ccc, and gave the Department of Health and Human Services ("HHS") the authority to implement it through Centers for Medicare & Medicaid Services ("CMS"). HHS promulgated 42 C.F.R. Chapter IV, and CMS established policies to implement the Medicare Act pursuant to this statutory mandate.

The Hospital is located in at 501 N. Lansdowne Avenue, Drexel Hill, Pennsylvania, and was previously enrolled as a "provider" of hospital services. Compl. ¶ 1; Compl. Ex. A at 1. To be eligible to be reimbursed for services to Medicare beneficiaries, the Hospital was party to a Medicare Part A provider agreement ("provider agreement"). 42 U.S.C. § 1395cc; 42 C.F.R. § 400.202

(defining "provider").

To participate in the Medicare program as a hospital, a facility must meet the statutory definition of a hospital (see 42 U.S.C. § 1395x(e)) and must comply with each of the Conditions of Participation for hospitals at 42 C.F.R. Part 482. A hospital is defined as a facility which, among other requirements, "(1) is primarily engaged in providing, by or under the supervision of physicians, to inpatients (A) diagnostic services and therapeutic services for the medical diagnosis, treatment, and care of injured, disabled, or sick persons, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons." 42 U.S.C. §1395x(e)(1). A hospital must have an active state license to participate in Medicare. 42 C.F.R. § 482.11.

### B.    Termination of a Part A Provider Agreement

The Medicare statute and regulations provide three avenues for termination of a provider agreement: (i) involuntary termination by CMS (42 C.F.R. § 489.53); (ii) involuntary termination by the HHS Office of Inspector General ("OIG") (42 C.F.R. § 489.54); or (iii) voluntary termination by the provider (42 C.F.R. § 489.52). *See also* 42 U.S.C. § 1395cc(b) ("Termination or Nonrenewal of Agreements"). An involuntary termination is an "initial determination" subject to administrative appeal rights. *Id.* §§ 489.53(e), 498.3(b)(8); *see generally* 42 U.S.C. § 1395ff(b) (providing administrative appeal rights for "initial determinations").

The Medicare Act also allows a provider, such as the Hospital, to voluntarily

"terminate an agreement with the Secretary . . . at such time and upon such notice to the Secretary and the public *as may be provided in regulations*, except that notice of more than six months shall not be required."  42 U.S.C. § 1395cc(b)(1) (emphasis added).  If a provider wishes to terminate its agreement, it should provide written notice to CMS.  *Id.* § 489.52(a).  Here, it is undisputed that the Hospital failed to provide written notice of its closure.  Accordingly, the regulation provides that "**[a] cessation of business is deemed to be a termination by the provider, effective with the date on which it stopped providing services to the community.**"  42 C.F.R. § 489.52(b)(3) (emphasis added).  A voluntary termination is not an "initial determination" subject to administrative appeal rights.  *Id.* §§ 489.52, 489.3(b).

## III.  FACTUAL AND LEGAL BACKGROUND

### A.  The Hospital's Plan to Close, Fire its Employees, and Potentially Reopen at Some Later Time

As of August 2021, the main entrance to the Hospital appeared normal, with open doors, parked cars, arriving patients, and an ambulance.  (D. Ex. 2):

5



In January 2022, the Hospital shut down its inpatient obstetrics unit, which includes labor and delivery, neonatal intensive care, and maternal fetal medicine.  D. Ex. 3.  In March 2022, the Hospital shut down its intensive care and surgical units, causing in-patient surgical procedures to be performed at other hospitals.  D. Ex. 4.

On September 21, 2022, Plaintiff notified PA DOH of its plan to merge the Hospital into another hospital it owned (Crozer Chester Medical Center or "CCMC").  Compl. ¶ 12; Compl. Ex. D.  In particular, Plaintiff planned to decrease the inpatient beds at the Hospital from 45 to 10, and, shortly after the merger:

> [T]here will be a temporary pause in certain operations at the Hospital and service relocations (which include an emergency department, an inpatient unit and ancillary services . . . and CCMC will commence a renovation project to convert this location into a behavioral health campus of CCMC that will house both psychiatric inpatient and outpatient services and drug and alcohol treatment services.

Compl. Ex. D at 1.  During the course of the renovation, the Hospital planned to provide limited services, including the: microbiology lab; maternal fetal medicine;

home health and hospice care; and EMS and medics' station.  *Id.* at 1-2.

In September 2022, Plaintiff submitted a WARN notice to the Pennsylvania Department of Labor and Industry concerning 334 affected employees.  D. Ex.5. The notice provided an effective date of November 26, 2022, and in the option between "closing" or "layoff," selected "Closure."  *Id.*

On November 4, 2022, the PA DOH notified the Hospital that it was imposing an order suspending emergency department services and banning admissions at the facility effective on November 7, 2022.  Compl. ¶ 13, Compl. Ex. F.  This action was taken due to the Hospital's failure to provide "diagnostic imaging coverage for the hospital, including the emergency department," which posed a "significant threat to the health and safety of patients."  *Id.*[2]

On December 6, 2022, a CBS article reported that several patients had arrived the prior month at the Hospital's Emergency Room only to learn that it had been shut down.  D. Ex. 6.  One such patient then "raced to an urgent care, collapsed, and was transported by ambulance to another hospital."  *Id.*  Another such patient, upon arriving at the Hospital, was "told by a security guard to search Google Maps for another hospital."  *Id.*

On May 17, 2024, the PA DOH issued an order denying Plaintiff's application

---

[2] The Complaint alleges that there is an ongoing appeal with the PA DOH related to this assessment, although the documentation related to the appeal was not attached.  *Id.* ¶ 13.

to merge the Hospital into CCMC's license.  Compl. ¶ 14, Ex. G at 5.  In particular, PA DOH "could not determine that the [Hospital] to be operated by the Applicant provide[s] safe and efficient services which are adequate for the care, treatment, and comfort of the patients or that there is substantial compliance with the rules and regulations" of the Pennsylvania Health Care Facilities Act.  *Id.*  PA DOH found that the Hospital "**does not intend to offer any services, care or treatment to inpatients at the Facility for the foreseeable future.**"  *Id.* (emphasis added).

On November 12, 2024, the PA DOH revoked the Hospital's license "for serious violations of the Department's regulations for licensure."  D. Ex. 7 at 2.

As of today, the Hospital's website shows that it is "Temporarily Closed."  D. Ex. 8.  The website does not indicate any plan to reopen the Hospital.  *Id.*

### B.    Litigation Regarding the Hospital's Closure Plan

On October 3, 2022, the prior owners of the Hospital filed an amended complaint against Plaintiff alleging that its plan to close the Hospital was in violation of their Asset Purchase Agreement and seeking to enjoin the closure.  *CKHS, Inc. v. Prospect Medical Holdings, Inc.*, No CV-2022-1716 (Pa. Ct. Common Pleas) (D. Exs. 9, 10).  On October 11, 2022, the presiding judge issued an order enjoining Plaintiff from closing the Hospital.  D. Ex. 11.  In response, Plaintiff filed an affidavit stating that it did "not plan to bring additional patients to DCMH as a result of the court's order."  D. Ex. 12 at 10.  Plaintiff then filed a motion to dissolve the

injunction, noting that "while the injunction obligates Prospect to keep the Emergency Room open, Prospect is in imminent risk of not having sufficient staff there, nor will the injunction lead to Emergency Medical Services bringing patients to the Emergency Room." *Id*. at 14.

Also on October 14, 2022, Plaintiff sent a letter to the PA DOH noting that "[p]hysician groups (including all of the cardiologists) and other staff have notified Prospect they are leaving the premises. Because the cardiologists are leaving, DCMH will not be able to admit cardiac patients." D. Ex. 12 at 1. In its brief, Plaintiff described this as "just the latest loss of important healthcare professionals necessary for a safe and functioning emergency room. . . . physicians are leaving the premises . . . ." *Id*. at 20. Plaintiff noted that, as of October 3, 2022, the Hospital "housed only approximately nine inpatients." *Id.*

During oral argument on October 28, 2022, Plaintiff stated that it is "nominally holding open an ER that no one will go to or feel comfortable going to." D. Ex. 13 at 8:15-17. Plaintiff noted that the cardiology and pulmonology groups had left (*id.* at 13:12-15:5) and that the number of inpatients was down to seven (*id.* at 40:15-16). Plaintiff acknowledged that it had announced that all employees at DCMH would be terminated before the court had issued its injunction. *Id.* at 84:20-85:6. In sum, Plaintiff described "grave situations" due to deceased staffing where staff would not be able to treat emergency admissions. *Id.* at 123:11-25.

On November 1, 2022, the court modified the injunction to allow Plaintiff to proceed with their plans precedent to the transition of the Hospital to a behavioral health facility.  D. Ex. 14.

On May 3, 2023, the Commonwealth Court issued an opinion on review of the Common Pleas' orders.  299 A.3d 179 (2023) (D. Ex. 15).  The court noted that that the PA DOH's "suspension of County Hospital's ability to admit patients and provide emergency department services was in direct response to Appellants' failure to adequately staff County Hospital." *Id.* at *4.  This matter is currently on appeal before the Pennsylvania Supreme Court.  117 MAP 2023 (Pa.).  *See* D. Ex. 16.

### C.     Termination of the Hospital's Provider Agreement

On  May  21,  2024,  Novitas  Solutions,  Inc.,  a  Medicare  Administrative Contractor,  gave  notice  to  Plaintiff  of  a  Medicare  enrollment  termination  and deactivation of billing privileges.  Compl., Ex. A.  Novitas noted that it had received notification from the PA DOH that the Hospital was "voluntarily terminating your provider/supplier agreement." *Id.*  The effective date of the Hospital's termination was  November  7,  2022. *Id.*  The  letter  afforded  Plaintiff  the  right  to  submit  a rebuttal, along with any supporting documentation, identifying any disputed findings of fact and the reasons for disagreement. *Id.*

On June 4, 2024, Plaintiff submitted its rebuttal to Novitas.  Compl., Ex. B. Plaintiff  asserted  that  it  did  not  close,  but  planned  a  "temporary  pause"  in  the

Hospital's operations. *Id.* at 2. Plaintiff noted that, after litigation described above had begun, it had an "exodus of employes and physicians." *Id.* Plaintiff acknowledged that, on November 4, 2022, the PA DOH issued an order "*suspending* emergency department services and imposing a *temporary* ban on DCMH inpatient admissions effective November 7, 2022." *Id.* (emphasis in original). Although Plaintiff disputed Novitas' finding of a cessation of services, Plaintiff did not assert that emergency room services had resumed and acknowledged that the only services being offered were "outpatient services." *Id.* at 4.

On July 1, 2024, Novitas issued an unfavorable determination concluding that there was no error made in the finding that Plaintiff had voluntarily terminated its billing privileges and that Plaintiff's billing privileges should remain deactivated. Compl. Ex. C.

## IV.   <u>STANDARD OF REVIEW</u>

A motion to dismiss for lack of standing arises under Federal Rule of Civil Procedure 12(b)(1) because "standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). Plaintiff has the burden to prove that jurisdiction does in fact exist and "'the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *Norman v. United States*, 1996 WL 377136, at *1 (E.D. Pa. July 3, 1996) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408-09 (3d Cir. 1991), *cert. denied*, 501 U.S. 1222

(1991)).  The court is "not confined to the allegations in the Complaint . . . and can look beyond the pleadings to decide factual matters relating to jurisdiction." *Cestonaro v. United States*, 211 F.3d 749, 752 (3d Cir. 2000).

## V.  <u>ARGUMENT</u>

The U.S. Constitution limits federal-court jurisdiction to actual cases or controversies. *Raines v. Byrd*, 521 U.S. 811, 818 (1997); U.S. Const. Art. III, § 1. Standing to sue is a doctrine derived from this limitation on judicial power. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The "irreducible constitutional minimum" of standing consists of three elements: the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Plaintiff bears the burden of establishing these elements. *Id.*

### A.    **Plaintiff Has Not Suffered an Injury in Fact**

To establish injury in fact, Plaintiff must show that it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  A "concrete" injury must be "real" and "not abstract." *Id.*

Although concrete injuries may be either tangible or intangible, neither type of injury exists here. *Id.* at 1549.  Plaintiff has not alleged a tangible injury because

the Complaint fails to allege that the termination resulted in any financial harm.[3]  As discussed below, Plaintiff did not suffer an intangible statutory injury related to the termination of its provider agreement because the termination was compliant with the Medicare laws and regulations.

### 1.    The termination of Plaintiff's provider agreement was consistent with the Medicare statute and regulations.

Under the Medicare laws and regulations, Plaintiff voluntarily terminated its billing privileges by ceasing to provide hospital services to the community.  The statute governing voluntary terminations (42 U.S.C. § 1395cc(b)(1)) explicitly incorporates the "Termination by the provider" regulation (42 C.F.R. § 489.52), which states that "[a] cessation of business is deemed to be a termination by the provider, effective with the date on which it stopped providing services to the community."  *Id.*  It is undisputed that, as of November 7, 2022, Plaintiff provided *none* of the services that make a hospital a "hospital" for the purposes of Medicare. *See* 42 U.S.C. §1395x(e)(1) (requiring a hospital to provide treatment to (i) inpatients; (ii) under the supervision of physicians; (iii) consisting of "diagnostic services and therapeutic services).

---

[3] Any tangible injury that *might* result from the termination of Plaintiff's billing privileges, such as Medicare overpayments, would entail administrative appeal rights and exhaustion before proceeding in federal court.  *See* 42 U.S.C. §§ 405(h), 1395ii; *Illinois Council v. Shalala*, 529 U.S. 1, 10-14 (2000) ("all aspects" of a grievance must be channeled through the administrative process).

First, the PA DOH imposed a ban on new admissions and the Hospital ceased in-patient care.  Second, the Hospital had suffered an "exodus" of physicians and other staff.  Third, the Hospital ceased providing diagnostic and therapeutic services because it closed its emergency and radiological departments.  Although the absence of any one of these requirements would be sufficient to find that a hospital had closed, here, all three are present.  For these reasons, the PA DOH found that the Hospital "**does not intend to offer any services, care or treatment to inpatients at the Facility for the foreseeable future.**"  Compl. ¶ 14, Ex. G at 5 (emphasis added).  Similarly, Plaintiff's WARN notice stated that the Hospital was closing, and Plaintiff successfully opposed attempts to keep the Hospital open.  D. Exs. 5, 14.

Because the Hospital ceased business under the applicable statute and regulations, Plaintiff cannot show that the Secretary's determination was erroneous. Indeed, Plaintiff does not allege that the Hospital provided hospital-level services after November 7, 2022, while Plaintiff's own website shows that the Hospital is temporarily closed.  D. Ex. 8.  And, of course, there is no statute or regulation allowing a hospital to "temporarily" close for any period of time, much less over two years as here, and remain enrolled in Medicare.  Meanwhile, offering limited outpatient services does not constitute providing hospital-level services to the community.  *See, e.g.*, *Trust Under Will of Wills v. Burwell*, 306 F. Supp. 3d 684, 696 (E.D. Pa. 2018) (finding that a hospital with a low ratio of inpatient to other beds

was "much less likely to qualify as a hospital" and citing a statement by HHS that entities concentrating "primarily on outpatient care" may not qualify as hospitals).

The case law strongly supports CMS's determination. In *Santiago v. Leavitt*, the plaintiff purchased a home health agency participating as a Medicare provider. 2008 WL 4131524, at *1 (N.D. Tex. Sept. 3, 2008). The plaintiff "temporarily discharged" all of the facility's patients while Medicare was processing its change of ownership application. *Id.* The plaintiff then sold the facility, along with its right to participate to Medicare, to a third party. *Id.* CMS ultimately imposed a voluntary termination under section 489.52 retroactive to a date seven months earlier, due to data showing that the facility had no patients. *Id.* The plaintiff then filed suit against the Secretary, among others, asserting a violation of due process rights and violation of administrative appeal rights. *Id.* at *2. In response, the Secretary moved to dismiss for lack of standing. The court held:

> [The plaintiff] admits that he dismissed [the facility's] patients. This action prompted CMS to terminate [the facility's] Medicare agreement. [The plaintiff] has not demonstrated an irreducible constitutional minimum of standing.

*Id. Leavitt* presents nearly identical facts, causes of action, and issues as this case. Because the Hospital closed its doors to patients as of November 7, 2022, it voluntarily terminated its Medicare provider agreement and lacks standing.

In *In re Center City Healthcare, LLC*, No. 19-cv-1711 (D. Del.), CMS appealed a bankruptcy court order finding that Hahnemann Hospital in Philadelphia

15

had not voluntarily closed.  In ruling for CMS, the district court noted that no doctors or patients remained at Hahnemann and that all former medical residents had gone to new hospitals.  D. Ex. 17 at 61:12-62:16 (Dkt. No. 32).  The court found that, although the hospital was still "providing referral services, forwarding copies of medical records, and subletting to other testing facilities," such activities did not satisfy the "'services' of the statutory requirement."  *Id.*  In sum, the court found that CMS had "demonstrated substantial likelihood that the Bankruptcy Court's finding that the hospital is still providing services to the community was clearly erroneous." *Id.*  The court thereafter granted the United States' emergency motion for stay pending appeal and stayed the bankruptcy court's sale order.  D. Ex. 18 (Dkt. No. 17).  The court also denied the debtor's subsequent emergency motion to modify the order granting a stay pending appeal.  D. Ex. 20 (Dkt. No. 29).

Several other courts have approved of CMS's finding of a voluntary termination in similar circumstances.  *See also, e.g.*, *Kaiser v. Blue Cross of Cal.*, 2006 WL 8448699, at *8 n.15 (D. Idaho Sept. 22, 2006) (finding that a hospital "terminated its provider agreement on the date it filed for Chapter 7 dissolution" and citing section 489.52(b)(3)); *In re BR Healthcare Sols., LLC*, 2021 WL 4597761, at *4 (W.D. Tex. Oct 6, 2021) (holding that a provider had voluntarily terminated by closing its doors and transferring patients to other facilities).  In sum, Plaintiff cannot establish an intangible injury because the Secretary's finding that the Hospital

voluntarily terminated its Medicare enrollment on November 7, 2022, was consistent with the Medicare laws and regulations.

### 2. Novitas was authorized to issue the termination letter.

Plaintiff also asserts that the termination letter should have come from CMS instead of Novitas. However, the termination letters attached to the Complaint appear on *dual* CMS and Novitas letterhead and were thus also issued on behalf of CMS. Compl. Exs. A, C. The issuance of these letters is consistent with Novitas' statutory authority to communicate with providers and perform program integrity functions. 42 U.S.C. § 1395kk-1(a)(4)(E), (H); *see generally Agendia, Inc. v. Becerra*, 4 F.4th 896, 902 (9th Cir. 2021) (holding the statutory and regulatory scheme for MACs is 'constitutional because the contractors 'function subordinately' to the Secretary.'"). Accordingly, Plaintiff cannot show that correspondence with Novitas caused any statutory violation, much less a concrete injury.

### 3. Plaintiff did not suffer a due process violation.

Plaintiff finally alleges that the termination of its Medicare billing privileges was a due process violation. Plaintiff, however, cannot show any unconstitutional taking of property, much less any requirement for a pre-deprivation hearing.

As an initial matter, there can be no procedural due process violation because a Medicare provider agreement is neither a statutory entitlement nor "property." A solid majority of courts of appeals have ruled that Medicare providers have *no*

*property interest* in their participation in the Medicare program, whether that be through Provider Agreements or provider numbers. *Shah v. Azar*, 920 F.3d 987, 997-98 (5th Cir. 2019) (explaining that providers "are not the intended beneficiaries of the federal health care programs"); *Erickson v. United States*, 67 F.3d 858, 862 (9th Cir. 1995) (concluding Medicare provider had no takings claim against the government for exclusion from Medicare program because he had no property interest in participation in the Medicare program); *Parrino v. Price*, 869 F.3d 392, 397-98 (6th Cir. 2017); *Senape v. Constantino*, 936 F.2d 687, 689-91 (2d Cir. 1991) (similar); *Koerpel v. Heckler*, 797 F.2d 858, 863-65 (10th Cir. 1986) (similar); *Cervoni v. Sec'y of Health, Educ. & Welfare*, 581 F.2d 1010, 1019 (1st Cir. 1978) (similar); *see also, e.g.*, *Hindley v. Dep't of Health & Human Servs.*, 2017 WL 1398257, at *9 (N.D. Cal. Apr. 19, 2017) ("There is no evidence the Secretary was required to provide Plaintiff with a [] supplier billing number.  In light of this, coupled with the voluntary nature of the [] program, Plaintiff cannot claim an entitlement to participate in the Medicare program as a [] supplier.  Accordingly, she does not have a property interest.").[4]

This Court was recently persuaded by the above decisions and held that a physician had "no protected property right in the continued participation and billing

---

[4] Although we are aware of only the Fourth Circuit holding otherwise, "four circuits have explicitly rejected that conclusion."  *Shah*, 920 F.3d at 997-98 n.30.

privileges in the Medicare program." *Lilia Gorovits, M.D., P.C. v. Becerra*, 2021 WL 1962903, at *6 (E.D. Pa. 2021); *see also, e.g.*, *Rite Aid of Pa., Inc. v. Houstoun*, 998 F. Supp. 522, 531 (E.D. Pa. 1997) (finding that plaintiff lacked a "protected property interest" in participating in Medicaid); *Ne. Emergency Med. Assoc. v. Califano*, 470 F.Supp. 1111, 1121 (E.D. Pa. 1979) (quoting *Cervoni* and holding that plaintiffs' "ability to receive reassigned Medicare Part B benefits does not amount to a 'property' interest.").

Even if Plaintiff showed a property interest in its provider agreement, it has not shown the need for a pre-deprivation hearing in the case of a *voluntary* termination. To determine what process is due in a particular situation, courts consider three factors: first, the private interest at stake; second, the risk of erroneous deprivation of that interest through the procedures used and the probable value of different procedures; and third, the government's interest. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 (3d Cir. 2013).

First, there is no private interest for a hospital that has closed to remain in the Medicare program. Second, to the extent that CMS might err in finding that a hospital has closed, the opportunity to provide a rebuttal before the termination becomes final addresses that concern. Third, the government has a substantial interest in ensuring that hospitals that have closed do not submit fraudulent claims

to Medicare.  *See Parkview Adventist Med. Ctr. v. United States*, 842 F.3d 757 (1st Cir. 2016) ("CMS has a strong public policy interest in seeing that Medicare-program dollars are not spent on institutions that fail to meet qualification standards. . . . Reimbursing [the hospital] . . . after it had taken actions to disqualify itself from the Medicare program, rendering it unable to provide services required by that program, would have been a waste of public monies."); *Johnson v. Becerra*, 668 F. Supp. 3d 14, 18 (D.D.C. 2023) ("CMS has the concomitant responsibility to terminate agreements with [providers] that fail to comply with the conditions and requirements of participation.").  In sum, there is no reason to provide administrative appeal rights to a party that voluntarily terminates its Medicare participation.

### 4.    Even if Plaintiff established a statutory violation, it would not suffice for Article III standing.

Even if Plaintiff established a statutory violation, which it has not, it still fails to show any intangible injury that is sufficiently concrete to create Article III standing.  The *Spokeo* Court explains:

> Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.  Article III standing requires a concrete injury even in the context of a statutory violation.  For that reason, [plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III.

578 U.S. at 341; *see also Kamal v. J. Crew Group*, 918 F.3d 102, 110-12 (3d Cir.

2019) (applying *Spokeo*).  Accordingly, two elements must be present for a statutory violation to constitute a cognizable injury: (1) Congress must have determined that the statutory violation is a sufficient injury to satisfy Article III; and (2) the harm must have "long been seen as injurious" under the common law.  *See Spokeo*, 578 U.S. at 341; *Kamal*, 918 F.3d at 111-15.[5]  Neither element is present here.

First, Congress has not determined that a party that has voluntarily terminated its Medicare provider agreement has suffered an injury, much less one sufficient to satisfy Article III.  To the extent Plaintiff could even show a statutory injury, such as issuance of the termination letter from Novitas, that would merely be a procedural violation "divorced from any concrete harm" that cannot "satisfy the injury-in-fact requirement of Article III."  *Spokeo* at 1549; *see also Thole v. U.S. Bank N.A.*, 590 U.S. 538, 541 (2020).

Second, Plaintiff has not suffered any harm that has long been recognized as injurious under the common law.  To the contrary, the common law recognizes the right to terminate a contract with a party that fails to perform its obligations, as Plaintiff did here by failing to maintain its statutory Conditions of Participation.

## B.    Plaintiff Cannot Satisfy the Other Elements of Standing

---

[5] In *Spokeo*, the Court provided examples of the type of procedural violations that can be sufficient to constitute injury in fact, such as the inability to obtain public information used for voting, or failure to obtain information subject to disclosure under federal law.  136 S.Ct. at 341-42.

Plaintiff has not alleged an injury traceable to the Secretary because the Hospital's voluntary closure was self-inflicted. "No [party] can be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976). In *Campeau v. Social Sec. Admin.*, the Third Circuit recognized that a "purely voluntary decision" does not suffice for standing because this "'self-inflicted injur[y] [is] not fairly traceable to the Government's purported activities.'" 575 F. App'x 35, 38 (3d Cir. 2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013)). In addition, the Hospital was charged with knowledge of the Medicare regulations and expected to know that closing its doors to patients would result in a voluntary termination. *See Heckler v. Cmty. Health Serv. of Crawford Co., Inc.*, 467 U.S. 51, 64 (1984) (persons 'who deal with the government are expected to know the law[.]").

Here, Plaintiff chose to temporarily close the Hospital in connection with its planned conversion to a behavioral health facility. That choice led to a cascade of consequences, whereby entire medical sub-practices, physicians, and staff left in anticipation of being laid off (which ultimately happened to those that stayed). The lack of staffing, and Plaintiff's failure to remedy the situation, led the PA DOH to effectively close the Hospital on November 7, 2022. Litigation ensued, to which CMS was not a party, whereby Plaintiff opposed an injunction to keep the Hospital open. The Hospital remained closed up to and following CMS's issuance of a

termination letter on May 21, 2024.  CMS's only involvement was recording the fact that the Hospital had *voluntarily* terminated its Medicare provider agreement by ceasing to offer services to the community.

Along similar lines, Plaintiff has no stake in the outcome of this case.  Even if the Court found that CMS improperly terminated the provider agreement, the Hospital remains closed and lacks the necessary licensure, staff, and resources to bill hospital-level serves to Medicare.  42 C.F.R. § 489.52(b)(3).  The Complaint does not allege that the Hospital plans to reopen.  Since the Hospital has no interest in continued Medicare enrollment, Plaintiff lacks a stake in the outcome of this matter.

Finally, Plaintiff takes issue with the retroactive date of its termination.  But given that Plaintiff neither alleges that the date of termination selected by CMS caused any specific injury nor that another termination date would alleviate its injuries, a favorable ruling could not redress Plaintiff's purported injury.  *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998) (explaining that a "worthless" judgment does not satisfy redressability.).

### C.    Plaintiff Has Not Alleged a Valid Basis for Federal Jurisdiction

An action is presumed to lie outside the Court's limited jurisdiction, and the burden of establishing the contrary rests on the party asserting jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  The United States and its agencies and officers are immune from suit unless it has consented to be sued.

*FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *United States v. Mitchell*, 445 U.S. 535, 538 (1980).  That consent can be effected only by an express and unequivocal waiver of sovereign immunity by Congress, and cannot be implied.  *See Lane v. Pena*, 518 U.S. 187, 192 (1996).

Plaintiff has not alleged any applicable waiver of sovereign immunity. Plaintiff's reliance on federal question jurisdiction fails because the statute does not contain a waiver of sovereign immunity.  *Clinton County Comm'rs v. U.S. Envt'l Prot. Agency*, 116 F.3d 1018, 1021 (3d Cir. 1997) ("[W]hen the plaintiff seeks to sue the United States or an instrumentality thereof, he may not rely on the general federal question jurisdiction of 28 U.S.C. § 1331, but must identify a specific statutory provision that waives the government's sovereign immunity from suit."); Compl. ¶ 3.  This Court has also rejected Plaintiff's assertion that the Mandamus Act operates as a waiver of sovereign immunity.  *See Berkery v. Comm'r*, No. 09-4944, 2010 WL 99376, at *4 (E.D. Pa. Jan. 11, 2010).  Meanwhile, the statute concerning termination of provider agreements neither contains a waiver of sovereign immunity nor a basis for federal jurisdiction.  *See* 42 U.S.C. § 1395cc(b).

Plaintiff's final basis for jurisdiction is under the three-factor *Thunder Basin* test discussed in *Axon Ents. v. FTC*, 143 S. Ct. 890 (2023).  To obtain jurisdiction in federal court outside of a statutory review scheme, courts consider whether (i) precluding district court jurisdiction would "foreclose all meaningful judicial

review" of the claim; (ii) the claim is "wholly collateral to [the] statute's review provisions"; and (iii) the claim is "outside the agency's experience." *Id.* at 186.  The Supreme Court, however, limited *Thunder Basin* jurisdiction to challenges regarding the "structure or very existence of an agency," as opposed to "enforcement-related matters." *Id.* at 903-04.  This case, however, involves Plaintiff's challenge to a single enforcement-related matter.

Even if the *Thunder Basin* test applies, Plaintiff has failed to show that its factors are met.  First, Plaintiff's assertion of two patently wrong bases for federal jurisdiction is not sufficient to show that judicial review is foreclosed.  Second, Plaintiff would have administrative appeal rights with respect to any overpayments that may be determined due to the termination, and could obtain judicial review after exhaustion and receipt of a final agency determination.  Third, terminations of provider agreements are plainly within the Secretary's expertise.  "[I]t is for the Secretary to decide administratively whether, how, and when [a] Provider Agreement with CMS was terminated." *Parkview Adventist Med. Ctr. v. United States*, 2016 WL 3029947 (D. Me. May 25, 2016), *aff'd* 842 F.3d 757 (2016). Questions concerning program termination "require application of the Medicare program laws and regulations governing how a provider and CMS may terminate a provider agreement, including the requirements for notice of intent to terminate or of involuntary termination, the effective date of termination, and the standards that

govern provider eligibility." *Id.*

Because Plaintiff has not alleged a valid basis for federal jurisdiction, this case should be dismissed.

## VI.    **CONCLUSION**

For the foregoing reasons, and because Plaintiff's lack of standing cannot be rectified by amending their Complaint, the Secretary respectfully requests that the Court grant his motion to dismiss for lack of subject-matter jurisdiction and dismiss the Complaint with prejudice.

Date: January 10, 2025

Respectfully submitted,


JACQUELINE C. ROMERO

United States Attorney


*/s/ Eric S. Wolfish*
ERIC S. WOLFISH
Special Assistant United States Attorney
Eric.Wolfish@hhs.gov
(215) 861-4511

Gregory B. David
Assistant United States Attorney
Chief, Civil Division
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Gregory.David@usdoj.gov
(215) 861-8521

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I caused a true and correct copy of the

foregoing to be served on all counsel of record via the Court's CM/ECF system.


*/s/ Eric S. Wolfish*
Eric S. Wolfish

*Counsel for Defendant*